# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| ISIS DRUCKEMILLER, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>NANCY A. BERRYHILL, )<br>Acting Commissioner of Social )<br>Security,[1] )<br>)<br>Defendant. ) | 1:16CV1322 |

### MEMORANDUM OPINION AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Isis Druckemiller, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Supplemental Security Income ("SSI"). (Docket Entry 2.) Defendant has filed the certified administrative record (Docket Entry 9 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 12, 14; see also Docket Entry 13 (Plaintiff's Memorandum); Docket Entry 15 (Defendant's Memorandum)). For the reasons that follow, the Court should enter judgment for Defendant.

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for Carolyn W. Colvin as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

## I. PROCEDURAL HISTORY

Plaintiff applied for SSI. (Tr. 322-30.)[2] Upon denial of that application initially (Tr. 173-83, 185, 223-31) and on reconsideration (Tr. 196-209, 211, 233-42), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 72, 243-45). Plaintiff, her non-attorney representative, and a vocational expert ("VE") attended the hearing. (Tr. 32-70.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 10-25.) The Appeals Council thereafter denied Plaintiff's request for review (Tr. 1-7, 8-9, 454-56), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that disability determination, the ALJ made the following findings later adopted by the Commissioner:

> 1. [Plaintiff] has not engaged in substantial gainful activity since April 22, 2014, the amended onset date.
>
> 2. [Plaintiff] has the following severe impairments: bipolar disorder/major depressive disorder; learning disorder by history; personality disorder; post-traumatic

---

[2] Plaintiff also applied for Child's Disability Insurance Benefits ("CDIB"), alleging an onset date of January 5, 2009, her eighteenth birthday. (See Tr. 13.) However, at the hearing, the ALJ pointed out that another ALJ had denied Plaintiff's previous claim for CDIB. (See Tr. 37; see also Tr. 146-59 (ALJ's decision dated August 29, 2013), 165 (reflecting Appeals Council denial of Plaintiff's request for review on February 24, 2014, thus making the ALJ's August 2013 decision the Commissioner's final decision).) Because Plaintiff remained eligible for CDIB only between her eighteenth and twenty-second birthdays, the ALJ advised that, absent new and material evidence relevant to the time period between January 5, 2009, and August 29, 2013, res judicata barred Plaintiff's current CDIB claim. (See Tr. 37-38.) After the hearing, Plaintiff amended her onset date to April 22, 2014, the date of her SSI application, and withdrew her application for CDIB. (Tr. 321.) In the ALJ's decision, he dismissed Plaintiff's CDIB claim on grounds of res judicata (see Tr. 14) and thus Plaintiff's SSI claim remains the only claim pending on judicial review.

stress disorder (PTSD); attention deficit hyperactivity disorder (ADHD); generalized anxiety disorder; history of ventricular-peritoneal shunt with headaches.

. . .

3. [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

4. . . . [Plaintiff] has the residual functional capacity to perform a full rage of work at all exertional levels, but with the following non-exertional limitations: [Plaintiff] can generally understand and perform simple, routine, repetitive tasks; she can maintain concentration, persistence and pace to stay on task for 2-hour periods over [the] course of [a] typical 8-hour workday with normal breaks, in a low stress work setting, which is further defined to mean no production-pace or quota-based work, rather a goal-oriented job primarily dealing with things rather than people; with no more than occasional changes in the work setting; and no more than occasional social interaction with supervisors and/or coworkers; but no work with the public as part of the job, such as sales or negotiation, though incidental or[]casual contact as it might arise in the workday is not precluded.

. . .

5. [Plaintiff] has no past relevant work.

. . .

9. Considering [Plaintiff's] age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform.

. . .

10. [Plaintiff] has not been under a disability, as defined in the [Act], from April 22, 2014, the amended onset date, through the date of this decision.

(Tr. 16-25 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of [the Court's] review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Plaintiff has not established entitlement to relief under the extremely limited review standard.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, the Court "must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted). "Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (brackets and internal quotation marks omitted). "If there is evidence to justify a

4

refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Commissioner]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the ALJ)." Id. at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" id.

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[3] "To regularize the adjudicative process, the Social Security Administration has . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id.

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' *i.e.*, currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of the Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[4] A finding adverse to the claimant at any of several points in the SEP forecloses an award and ends the inquiry. For example, "[t]he first step determines whether the claimant is

---

[3] The Act "comprises two disability benefits programs. The Disability Insurance Benefits Program provides benefits to disabled persons who have contributed to the program while employed. [SSI] provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[4] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [Commissioner] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[5] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can perform past relevant work; if so, the claimant does not qualify as disabled. See id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work

---

[5] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

7

experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Commissioner cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.[6]

## B. Assignment of Error

In Plaintiff's sole issue on review, she contends that "[t]here is a reasonable possibility that evidence submitted to the [Appeals Council] would have changed the outcome of the decision of the ALJ." (Docket Entry 13 at 4 (bold font omitted).) More specifically, Plaintiff notes that "[t]he ALJ found that [Plaintiff] had only moderate limitations in social functioning and [concentration, persistence, or pace ("CPP")] because, despite her extensive history of violent altercations with others and difficulties focusing due to severe bipolar disorder, later treatment notes in 2015 demonstrated improvement with further treatment." (Id. (citing Tr. 18, 21 (reflecting ALJ's observation that, "[w]hile [Plaintiff] has at times exhibited poor concentration, judgment and insight on mental status examinations, treatment notes since July 2015 show her being intact in these

---

[6] A claimant thus can establish disability via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. See, e.g., Hunter, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

areas as well as having normal cognition and memory on mental status examinations with treatment/medication changes").) According to Plaintiff, "evidence submitted to the [Appeals Council] and which relates to the relevant time period, however, demonstrates that [Plaintiff's] temporary improvement in symptom[at]ology from July through September of 2015 did not last with an additional hospitalization in December 2015 and her being placed in an Assertive Community Treatment ("ACT") team in January of 2016 due to severe and intractable bipolar symptom[at]ology affecting her ability to maintain a safe living situation, perform routine tasks for basic adult functioning, and avoid run ins with the criminal justice system and meet basic survival needs." (Id. at 5 (citing Tr. 735, 739-40).) Plaintiff thus faults the ALJ for "cherry pick[ing] a three month period from July through September of 2015 when [Plaintiff's] concentration, insight and judgment were noted to be intact to find her capable of sustaining CPP and work relationships well enough to perform unskilled work." (Id. at 8 (citing Klaus v. Colvin, No. 1:13-cv-180-JAB-JEP, 2016 WL 1435687, at *6 (M.D.N.C. Apr. 11, 2016)).)

Lastly, Plaintiff argues that the Appeals Council failed to explain how it considered the new evidence in its denial of Plaintiff's request for review. (Id. at 11 (citing Tr. 2).) Plaintiff maintains that such failure requires remand, because "'no fact finder has made any findings as to the treating physician's

9

opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record' and because '[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder[, a court] cannot undertake it in the first instance.'" (Id. (quoting Meyer v. Astrue, 662 F.3d 700, 707 (4th Cir. 2011)).)

"[T]he Appeals Council is required to consider new and material evidence relating to the period on or before the date of the ALJ decision in deciding whether to grant review." Wilkins v. Secretary, Dep't of Health & Human Servs., 953 F.2d 93, 95 (4th Cir. 1991). "Evidence is new within the meaning of [the Commissioner's regulations] if it is not duplicative or cumulative." Id. at 95-96; see generally Associate Comm'r of Hearings and Appeals, Soc. Sec. Admin., Pub. No. 70-074, Hearings, Appeals, Litig., and Law (LEX) Manual, § I-3-306(A) (1990). "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Wilkins, 953 F.2d at 96 (citing Borders v. Heckler, 777 F.2d 954, 956 (4th Cir. 1985)).

Here, the Appeals Council considered Plaintiff's new evidence and incorporated it into the record (see Tr. 2, 5, 729-42), but concluded that the medical report from Morrow M. Dowdle, PA-C with Triangle NeuroPsychiatry dated March 31, 2015, and treatment records from DayMark Recovery Services dated January 29, 2016, to

10

May 12, 2106, did "not provide a basis for changing the [ALJ's] decision" (Tr. 2).[7]

As an initial matter, and contrary to Plaintiff's contention, the ALJ did not <u>solely</u> rely on "a three month period from July through September of 2015 when [Plaintiff's] concentration, insight and judgment were noted to be intact to find her capable of sustaining CPP and work relationships well enough to perform unskilled work." (Docket Entry 13 at 8.) The ALJ did cite to the time period from July through September 2015 as demonstrating an improvement in Plaintiff's mental symptoms:

> While [Plaintiff] has at times exhibited poor concentration, judgment and insight on mental status examinations, treatment notes since July 2015 show her being intact in these areas, as well as having normal cognition and memory on mental status examination with treatment/medication changes.

(Tr. 21 (internal citations omitted); <u>see also</u> Tr. 21-22 (noting that "mental health progress notes [subsequent to June 10, 2015] reflect continued improvement in [Plaintiff's] energy, sleep, motivation, stress tolerance, anger control, concentration, insight and judgment on her current treatment regimen with only occasional paranoia noted on July 13[, 2015]" (internal citation omitted)).)

However, the ALJ also provided the following, additional analysis to support the mental RFC:

---

[7] Plaintiff does not argue that the medical report from Dowdle provides a basis for changing the ALJ's decision. (<u>See</u> Docket Entry 13.) Thus, this Recommendation will focus on the new DayMark Recovery Services treatment records. (<u>See</u> Tr. 732-41.)

11

. . . [Plaintiff] described/reported an array of daily activities that are consistent with the work detailed above in [the RFC], including caring for a pet, performing household chores, and caring for her mother, who also has mental (and physical) problems. As to [Plaintiff's] other mental impairments, [she] had a troubled childhood and she resided in group homes and foster care homes at times. [Plaintiff] has a longitudinal history of mental health treatment, and she had a brief involuntary commitment in June 2015 due to suicidal ideation. However, she responded quickly to administered treatment and she was in stable, improved condition on discharge. Mental health treatment notes dating back to 2011 show [Plaintiff] was not taking psychotropic medication as directed at times because she was thinking about possibly becoming pregnant and/or because she was tired of it. During periods when she was off treatment and medication, [Plaintiff] exhibited some increased symptoms, but she improved once she returned to her treatment and medication regimen.

Treatment notes from January 2014 show [Plaintiff] still attempting to conceive and her mental status examinations in 2014 through June reflect impaired concentration, insight and judgment. However, medication titration/ changes were still occurring; she had improved concentration and mood stability by July 10, 2014. It appears [Plaintiff] was lost to mental health treatment for a time. The records show [Plaintiff] underwent a psychopharmacology evaluation due to increased symptoms in March 2015, but she nonetheless exhibited fair concentration and focus on mental status examination. [Plaintiff] returned to medication with changes and [was] recommended counseling at this time. [Plaintiff] reported increased stressors in April 2015 resulting in medication changes, including the commencement of a trial of Risperdal, which [Plaintiff] contends was responsible for her assaulting her mother in May 2015. [Plaintiff] presented to the emergency room on June 5, 2015 due to reported paranoia and bipolar disorder after [being] recently released from jail. However, her symptoms improved with administered treatment, and she appeared alert, oriented with a pleasant mood and calm affect at discharge. Due to the assault on her mother, ensuing criminal charges and probationary period, [Plaintiff] underwent a diagnostic assessment on June 10, 2015. As a result, [Plaintiff's] treatment regimen changed with the need for stable living accommodations, medication and

12

> outpatient therapy required to prevent risk of
> decompensation. Notably, [Plaintiff's] bipolar disorder
> was found to be in partial remission, moderate . . . .

(Tr. 21 (internal citations omitted).) Thus, in addition to Plaintiff's improvement between June and September 2015, the ALJ relied on Plaintiff's (1) daily activities, and (2) mental health treatment records dating back to 2011, to demonstrate that, although Plaintiff had cyclical periods of worsening symptoms, when she attended treatment and took her medications compliantly, her mental symptoms improved to a point consistent with the ability to perform the work identified in the mental RFC.[8]

Moreover, although the evidence in question qualifies as "new" and relates to the period prior to the ALJ's decision, it lacks materiality (i.e., it presents no reasonable possibility of a

---

[8] Plaintiff asserts that "the ALJ failed to consider that intermittent medication non-compliance is a symptom of [Plaintiff's] disease," but provided no citation to the record to support the assertion that Plaintiff's mental impairments caused her failure to take medication as prescribed. (Docket Entry 13 at 10.) Moreover, no mental health treatment provider of record opined (or even implied) that Plaintiff's mental disorders caused her medication non-compliance. (See, generally Tr. 530-84, 657-98, 700-15, 717, 730, 732-41.) Further, although Plaintiff alleges that "the ALJ did not perform the requisite analysis regarding good cause to not follow prescribed treatment" (Docket Entry 13 at 10 (citing 20 C.F.R. § 404.1530)), Section 404.1530 of the regulations governs the grounds on which an ALJ may deny or stop benefits due to failure to follow prescribed treatment. Here, the ALJ did not deny Plaintiff benefits because of her medication non-compliance, but simply noted that, during periods of compliance, Plaintiff's symptoms typically improved. (See Tr. 21, 22.) Furthermore, Plaintiff has not adduced any evidence demonstrating "good cause" for her failure to follow prescribed treatment. (See Tr. 544 (reflecting that Plaintiff had not taken her medications because she forgot to fill her prescription), 641 (indicating that Plaintiff did not want to take psychiatric medication and that Plaintiff had grown "tired of taking medication"), 643 (documenting that Plaintiff had "been off her med[ication]s for a while as she had been thinking about getting pregnant"), 703 (noting that Plaintiff reported not taking her medications), 733 (recording Plaintiff's statement: "I'm gonna be honest with you, they gave me medication and I'm suppose[d] to take it but I don't usually take it. I maybe take it on[c]e every couple of weeks at most").)

different outcome, Wilkins, 953 F.2d at 95). The new treatment records from DayMark Recovery Services show that Plaintiff <u>self-referred</u> to DayMark on January 29, 2016, for entrance into the ACT program after an exacerbation of symptoms during the holidays. (See Tr. 733.) Despite sporadic outpatient treatment and only taking her medication once "every couple of weeks at the most," Plaintiff reported only "mild depressive symptoms." (Id.) Plaintiff did report racing thoughts and auditory and visual hallucinations (see id.), and the mental status examination documented a disheveled appearance, agitation, a flat affect, circumstantial speech, and a depressed, anxious, and irritable mood (see Tr. 736-37). However, no follow-up treatment appears of record until over three months later on May 12, 2016. (See Tr. 732.) At that time, Plaintiff reported to Dr. Thomas A. Wilson that her medication worked satisfactorily without side effects and she denied any further hallucinations. (Id.) On mental status examination, although Plaintiff appeared irritable and "somewhat disheveled," she remained cooperative with normal speech and cognition. (Id.) Thus, this new evidence continues to show that Plaintiff had periodic exacerbations when she did not take her medication, but that her symptoms improved once she resumed compliance.

Moreover, despite Plaintiff's characterization of the new evidence as material (Docket Entry 13 at 11-12 (arguing that "there

14

is a reasonable possibility that [the new evidence] would have changed the outcome in this case as they demonstrate that [Plaintiff's] mental functioning improvement from July through September of 2015 was only temporary")), she makes no attempt to show how that evidence reasonably could alter the ALJ's determinations (see id. at 4-12). Notably, Plaintiff neither argues that the new evidence establishes that she meets or medically equals any of the Commissioner's listings nor explains how the evidence should alter the RFC (let alone how such alteration would impact her ability to perform the jobs cited by the VE). (Id.)

Finally, Meyer does not provide a basis for remand. In that case, the ALJ had commented on the absence of any restrictions from a treating physician. Meyer, 662 F.3d at 703. Thus, when the plaintiff submitted new evidence to the Appeals Council containing restrictions from his treating physician, the Fourth Circuit noted:

> On consideration of the record as a whole, we simply cannot determine whether substantial evidence supports the ALJ's denial of benefits here. <u>The ALJ emphasized that the record before it lacked "restrictions placed on the claimant by a treating physician," suggesting that this evidentiary gap played a role in its decision</u>. Meyer subsequently obtained this missing evidence from his treating physician. That evidence corroborates the opinion of Dr. Weissglass, which the ALJ had rejected. But other record evidence credited by the ALJ conflicts with the new evidence. The Appeals Council made the new evidence part of the record but summarily denied review of the ALJ decision. <u>Thus, no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record</u>. Assessing the

15

> probative value of competing evidence is quintessentially the role of the fact finder. We cannot undertake it in the first instance. Therefore, we must remand the case for further fact finding.

Id. at 707 (emphasis added). In contrast, no such evidentiary gap existed in this case. The record already contained multiple treatment records from Dr. Thomas A. Wilson (see Tr. 537-84, 721-28), which the ALJ expressly discussed (see Tr. 21, 23). Thus, a "fact finder has [already] made . . . findings as to the treating physician's opinion [and] . . . reconcile[d] that evidence with the conflicting and supporting evidence in the record." Meyer, 662 F.3d at 707.

## II. CONCLUSION

Plaintiff has not established an error warranting relief.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be affirmed, that Plaintiff's Motion for Judgment on the Pleadings (Docket Entry 12) be denied, that Defendant's Motion for Judgment on the Pleadings (Docket Entry 14) be granted, and that this action be dismissed with prejudice.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

August 16, 2017